IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| N.P. *b/n/f Lindsey P.*, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:24-CV-457-RP |
| | § | |
| LAGO VISTA INDEPENDENT SCHOOL DISTRICT, | § § § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court is Defendant Lago Vista Independent School District's ("LVISD") Motion for Judgment on the Administrative Record, (Dkt. 23), Plaintiff N.P. by and with and through his next friend Lindsey P.'s ("N.P") Motion for Summary Judgment, (Dkt. 22), and responsive briefing. Having considered the parties' arguments, the evidence, and the relevant law, the Court will grant LVISD's Motion for Judgment on the Administrative Record and deny N.P.'s Motion for Summary Judgment.

### I. BACKGROUND

N.P. is a minor and a student at Lago Vista Middle School, part of LVISD. This case concerns whether LVISD violated the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482, et seq. ("IDEA") with N.P.'s Individualized Education Plan ("IEP"). LVISD's proposed IEP plan would place him in the Functional Academics Classroom ("FAC") setting for English Language Arts ("ELA"), math, and 50 percent of science and social studies. (Certified Administrative Record (hereinafter "AR"), Dkt. 21, 1091, 1096−1097). N.P. filed a request for a Due Process Hearing on February 24, 2023, alleging that LVISD failed to provide him with a Free Appropriate Public Education ("FAPE") under the IDEA, including because the placement in the FAC renders the plan not his least restrictive environment ("LRE") as the IDEA requires. The hearing was held in November 2023 before a Special Education Hearing Officer ("SEHO"). (AR,

1

Dkt. 21, at 4). At the time, N.P. was a seventh-grade student. (*Id.* at 8). The SEHO concluded that LVISD did not violate the IDEA with his IEP plan in a decision issued January 24, 2024. (*Id.* at 3−4). N.P., through his next friend Lindsey P., has appealed the decision of the SEHO by filing suit in this Court. (Compl., Dkt. 1).

N.P. has been eligible for special education services under the IDEA since preschool due to his "other health impairment" and speech impairment. (AR, Dkt. 21, at 8). N.P. has a medical history including hydrocephalus and posterior encephalocele, a condition where the brain begins to form outside of the skull during gestation, which was treated by removing a portion of his cerebellum shortly after birth. (Def.'s Mot. Summ. J., Dkt. 23, at 10). N.P. has also been diagnosed with additional conditions including hydrocephalus with endoscopic third ventricle, Sprengel's deformity, and a tethered spinal cord with release seizures. (*Id.*). N.P. has orthopedic impairments due to a hand deformity, speech impairment in articulation, and a diagnosis of Cortical Visual Impairment ("CVI"). (*Id.* at 8). CVI is a disorder caused by damage to the brain that can cause difficulty with processing visual information. (*Id.* at 17). N.P.'s admission, review, and dismissal ("ARD") committee (the committee of teachers, district personnel, and parents responsible for formulating the IEP) has evaluated and re-evaluated his IEP several times. (AR, Dkt. 21, at 8−21). N.P. has previously entered a settlement agreement releasing all claims against LVISD arising before December 7, 2022. (*Id.* at 8, 14). The Court's analysis therefore focuses only on the events that happened after that date and the most recent iterations of the IEP plan, which are the source of the current dispute.

An annual ARD committee meeting was held February 6, 2023. (AR, Dkt. 21, at 14). The committee considered N.P.'s levels and goals in his courses. (*Id.*). N.P.'s math teacher reported that N.P. is "missing many foundational skills" which prevent him from completing assignments without 1:1 support, that he does not retain new skills from one class to another, and that not understanding

the assignments is causing N.P. frustration. (*Id.* at 1033). The ELA teacher noted he "struggles to work on the [ ] material at the same pace as his peers," and "needs more time to process, more support reading modified texts, and a significantly more amount of support in written responses." (*Id.* at 1031). N.P's parents attended the meeting and agreed to some revisions of his plan but disagreed with the recommendation of the ARD committee for N.P. to receive ELA and math instruction in the FAC classroom. (*Id.* at 17). The ARD committee met again on February 16, 2023, and N.P.'s parents agreed to additional accommodations for his CVI but continued to disagree with the proposed placement in the FAC classroom. (*Id.* at 1068–71). At the February 16 meeting, the ARD committee reviewed N.P.'s CVI diagnosis and added accommodations for his visual disability, including training for his teachers. (*Id.*). Continuing to oppose the placement in the FAC classroom, N.P. sought a Due Process Hearing on February 24, 2023, placing on hold the changes that the ARD committee agreed to in the meeting. (*Id.* at 44–49).

Pending review of the IEP, evaluations of N.P.'s condition and performance in the classroom continued. Dr. Laura Frame, a school psychologist, conducted an Independent Neuropsychological Evaluation ("IEE"), (*id.* at 945–77), which the ARD committee reviewed on April 27, 2023, (*id.* at 1089–90). Dr. Frame recommended that N.P. requires "intensive small group instruction." (*Id.* at 962). N.P's science teacher reported that he cannot independently complete his work, that he needs his assignments modified to a third grade level, and that he still fails his assessments frequently. (*Id.* at 1086). N.P.'s World Cultures teacher reported that N.P. is "not independently able to initiate or complete tasks" and "without one on one support . . . he does not initiate tasks" and "redoes assignments given in an alternative method." (*Id.* at 1087). The ARD committee recommended he receive 50 percent of his weekly instruction in science and social studies in the FAC classroom, in addition to his math and ESA coursework. (*Id.* at 1091). N.P.'s parents continued to disagree with the FAC placement and raised concerns that N.P. has a visual

3

disability. (*Id.* at 1089). The ARD committee reconvened on May 19, 2023, and suggested a new Functional Vision Evaluation ("FVE") based on the parents' concerns about N.P.'s vision in light of the CVI diagnosis shared at the April 27, 2023 meeting. (*Id.* at 1091–92).[1] LVISD completed the most recent FVE on October 6, 2023, (*id.* at 1411), and based on the most recent FVE results, the ARD committee recommended visual accommodations including consultation/training services for teachers and a trial use of a light box. (*Id.* at 1423, 1168–69). Pending the due process hearing and litigation, LVISD has not implemented these revisions to the IEP, but rather, N.P. remains in his IEP plan as of February 2022 and attends education in the general LVISD classroom with preexisting supports. (Def.'s Mot. Summ. J., Dkt. 23, at 19).

Following the underlying due process hearing, the SEHO agreed that the proposed IEP constituted the LRE for N.P. and found it satisfied the IDEA. In reaching this decision, the SEHO concluded that:

> The District's proposed IEP is designed to meet [N.P.]'s individual needs. In order to gain academic benefit from his education, [N.P.] needs to develop prerequisite skills and to receive substantial supports. The District's proposed placement in the FAC is specifically designed to develop those pre-requisite skills and provide [N.P.] with the one-on-one support that he needs. Additionally, the proposed IEP keeps [N.P.] in a general education environment for half of his time in science and social studies as well as in his electives. This will allow him to continue to receive the non-academic benefits of remaining with his peers without disabilities to the extent possible while providing him with meaningful academic benefit.

(AR, Dkt. 21, at 34). N.P.'s appeal to this Court followed. (Compl., Dkt. 1).

## II. LEGAL STANDARD

Because Texas receives federal education funding, all school districts within the state must comply with the IDEA. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th Cir.

---

[1] N.P. had previously had a FVE conducted in 2022, during his fifth-grade year, (AR, Dkt. 21, 879–882, 932–33), which diagnosed him with CVI.

1997). Congress enacted the IDEA to ensure children with disabilities receive a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). To achieve this goal, the IDEA requires states to educate children with disabilities "to the maximum extent possible with nondisabled children in the least restrictive environment consistent with [the child's] needs." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 128 (5th Cir. 1993). A school district need not provide the best possible FAPE "nor one that will maximize the child's educational potential." *Michael F.*, 118 F.3d at 247. Instead, "[t]he FAPE must be tailored to each disabled child's needs through an [IEP], which is a written statement prepared [by a committee composed of] a 'qualified' and 'knowledgeable' school district representative, a teacher, the child's parents or guardians, and, when appropriate, the child himself." *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 925 (W.D. Tex. 2008) (citing 20 U.S.C. § 1414(d)(1)(B)). In Texas, the ARD committee is responsible for preparing a student's IEP. *Id.*

The IDEA allows a party to file a complaint and obtain a due process hearing conducted by a local or state educational agency on "any matter relating to the identification, evaluation, or educational placement of the child." *Id.* (citing 20 U.S.C. § 1415(b)(6)). A state educational agency such as a SEHO may review an appeal of a due process hearing. *See id.* at 923; *see also* 20 U.S.C. § 1415(g)(1). Under the IDEA, any party aggrieved by the SEHO's findings and decision may bring suit in district court. 20 U.S.C. § 1415(i)(2)(A). "Under the IDEA, a federal district court's review of a [SEHO's] decision is 'virtually de novo.'" *Adam F. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003). "The hearing officer's findings should be accorded 'due weight,' but the district court must arrive at an independent conclusion based on a preponderance of the evidence." *Id.* As such, even though it is termed summary judgment, the existence of a disputed material fact

will not defeat a summary judgment motion when a district court reviews an IDEA appeal. *Reyes v. Manor Indep. Sch. Dist.*, No. A-14-CA00469, 2016 WL 439148, at *4 (W.D. Tex. Feb. 2, 2016).

The IDEA creates a presumption in favor of a school district's IEP. *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). Accordingly, the party challenging the IEP bears the burden of showing the IEP was inappropriate under the IDEA. *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 n.4 (5th Cir. 2009). A district court should not substitute its "own notions of sound educational policy for those of the school authorities which [it] review[s]." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982). To that end, a district court's task is to determine whether a school district complied with the IDEA and not to second guess their educational decision making. *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1010 (5th Cir. 2010). To sustain a challenge to the IEP, N.P. must demonstrate either that LVISD failed to comply with the procedures set forth in the IDEA or that the IEP developed by LVISD was not reasonably calculated to enable N.P. to receive educational benefits. *Rowley*, 458 U.S. at 206−07.

## III. DISCUSSION

### A. LVISD Provides N.P. with a Reasonably Calculated Public Education

Courts evaluate whether an IEP is reasonably calculated considering four factors: (1) whether the program is individualized based on the student's assessment and performance; (2) whether the program is administered in the least restrictive environment; (3) whether the services are provided in a coordinated and collaborative manner by the key stakeholders; and (4) whether positive academic and nonacademic benefits are demonstrated. *See Michael F.*, 118 F.3rd at 253.

Applying the four *Michael F* factors, the Court finds that the proposed IEP satisfies its review under the IDEA.

1. <u>The IEP is individualized</u>

First, the IEP is individualized to N.P.'s disabilities, including his CVI. A court looks not to whether a school district properly diagnosed or labeled a child, but whether the IEP itself is individualized to meet the student's particular needs and provide them with educational benefits. *See Lauren C. v. Lewisville Indep. Sch. Dist.*, 4:15-CV-00544, 2017 WL 2813935, at *6 (E.D. Tex. 2017). The record shows N.P. has individual needs including visual processing time, a slower pace of instruction, and significant repetition to grasp educational concepts. (*E.g.*, AR, Dkt. 21, at 1424). The proposed IEP accounts for these needs in several ways. Special Education Teacher at LVISD, Andrea Reedy, described the FAC setting at a reconvene meeting in May 2022, and explained that the FAC classroom "consists of low student to staff ratio, visual supports, built in opportunities for repetition, adapted curriculum," and that it would provide the "targeting pre-requisite skills, explicit social skills instruction, and [a] class environment which allows the teacher to build upon N.P.'s strengths and weaknesses" as described in the IEP. (AR, Dkt. 21, at 1141–42). The IEP also includes accommodations related to visual processing and has since April 27, 2021, when it "included breaks from visual work; flexible seating; use of a large button calculator; minimizing whiteboard-to-desk copying . . .; copies of class notes; large print materials; reduced amount of visual information on worksheets; extra time for completing assignments; opportunity to respond orally in lieu of written responses; opportunity to type in lieu of writing; oral exams; reduced length of assignments; and the use of an iPad with a keyboard." (AR, Dkt. 21, at 839–40).

The crux of N.P.'s argument is that LVISD has "ignored N.P.'s visual impairment." (Pls.' Resp., Dkt. 24, at 2). Taking aside that sweeping statement, N.P.'s briefs largely focus on the fact that the district failed to diagnose N.P. with a CVI until 2022 and argue that his IEP is not

7

appropriately individualized as a result. (*Id.* at 1–5). But the record shows that LVISD has known about N.P.'s visual processing needs since at least 2019. (*E.g.*, AR, Dkt. 21, at 1565, 1555 (2019 LVISD evaluation report noting low visualization abilities as part of an overall evaluation of N.P.'s cognition)). And as described above, his 2021 IEP included visual processing-related accommodations. (AR, Dkt. 21, at 839–40). So too, N.P.'s 2022 neurophysiological evaluation also showed that he had difficulty processing complex verbal and visual information, and diagnosed him with CVI. (AR, Dkt. 21, 879–882, 932–33). While it is true that components of N.P.'s plan were created without reference to a CVI diagnosis specifically, that fact alone does not mean the plan is not tailored and individualized to him appropriately. *See Lauren C.*, 2017 WL 2813935, at *6. Rather, the ARD committee had before it several indicators of N.P.'s visual processing disabilities when it created the IEPs. In other words, for purposes of the IEP, the CVI diagnosis reflected information that was already known about N.P: that he requires additional processing time and other accommodations related to his visual disability. *Id.* Here, the CVI diagnosis does not provide unique information, nor put the LVISD on alert to needs that were previously unknown. So, contrary to Plaintiff's assertions, the fact that N.P.'s CVI diagnosis occurred in late 2022 does not mean the district made his IEP plan without reference to his visual processing difficulties. Rather, the record shows that the IEP is appropriately individualized to his needs.

N.P. argues that *Caldwell Independent School District v. Joe P.*, 994 F. Supp. 2d 811, 821 (W.D. Tex. Sept. 28, 2012), resolves this case in his favor. (Resp., Dkt. 24, at 1). There, the district court agreed with the SEHO and found that the proposed IEP plan violated the IDEA and denied the student a FAPE because it inadequately accommodated his CVI. *Id.* But N.P. ignores the differences between *Caldwell* and the instant case. For one, in *Caldwell*, the district court affirmed the decision of the SEHO officer in finding that the school district had failed to inform teachers about his visual disability, and noted that his teachers were left to believe his symptoms were the result of inattention

or distraction. *Id.* at 822, n. 8. Here, by contrast, the record does not show a lack of understanding of N.P.'s condition on the part of LVISD. N.P. points to examples in the record of an assistant principal and general education teacher being unable to define CVI specifically, (Resp., Dkt. 24, at 2), but that does not mean the teachers generally did not understand N.P.'s visual disabilities or failed to adequately try to accommodate his needs in the classroom. Also, the record shows that N.P.'s World Cultures, Texas History, Resource Math, and Resource ELA teachers—the teachers whose classes are at issue in this litigation—had training regarding CVI and confirmed at the hearing that they had accommodations in place for N.P.'s visual processing needs. (AR, Dkt. 21, 3341, 3346−47, 3932, 3972, 3678, 3864).

Finally, the *Caldwell* court explained that the school district failed to understand the student's visual impairment and how it impacted the student. *Caldwell*, 994 F.Supp.2d at 820. The court noted it did not focus on the formal diagnosis of CVI in the school district's files. *Id.* Here, by contrast, N.P.'s diagnosis of CVI reiterated earlier manifestations of his difficulties with processing visual information, which, as described above, LVISD and the ARD committee knew about and considered when creating the IEP. And the Court notes that while N.P. argues that the IEP fails legal scrutiny because it fails to accommodate his CVI, N.P. has not pointed out accommodations for his visual disability that it fails to include. Rather, this case revolves around the fact that N.P.'s parents dispute his placement in the FAC classroom.[2] N.P.'s plan is appropriately individualized, including to his visual processing disability and CVI.

2. The IEP program will be administered in the least restrictive environment

The proposed IEP also places N.P. in the LRE: it proposes placing N.P. in the FAC setting for ELA and math instruction and for 50 percent of his science and social studies instruction, with

---

[2] Plaintiff also argues that N.P.'s IEP had visual accommodations "removed," but the record shows that the accommodations were modified to reflect N.P.'s current needs based on more recent ARD committee meetings. (Def.'s Reply, Dkt. 27, at 4−8 (explaining recent changes to N.P.'s proposed accommodations

art instruction in a general education setting. (AR, Dkt. 21, 1091, 1096–97). N.P. argues that this plan is not the LRE. The Court disagrees.

In analyzing whether a student may be removed from a general education environment consistent with the IDEA's goal of educating students in their LRE, the Fifth Circuit has developed a two-part test. *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989). First, the court looks to whether education in the regular classroom with the use of supplemental aids and services can be achieved satisfactorily, and if not, whether the IEP places the student in the most mainstream environment appropriate. *Id.* When determining whether education in a general setting can be achieved satisfactorily, the court is to examine: (a) a school district's efforts to provide the student with modifications and supplemental aids to meet the student's individual needs; (b) the educational benefit the student is receiving while placed in the general education setting; and (c) the impact the presence the student with a disability has on the general education setting and the education of the other students in the setting. *See id.* at 1048–51. Considering these factors in N.P.'s case, the IEP appropriately proposes the LRE.

First, as to the efforts to provide modifications and supplemental aids in the classroom, a court looks to whether LVISD took broad steps to modify the regular education environment with more than "token gestures," but LVISD is not required to provide "every conceivable supplementary aid or service" to assist the child in the general education setting, either. *Id.* at 1048. The standard does not require the district to modify the curriculum "beyond recognition." *Id.* Here, LVISD has provided N.P. with individualized aids and meaningfully modified the curriculum. The record shows that N.P. has had his math work reduced by more than half, that an additional teacher

---

based on observations by N.P.'s teachers and evaluators)). N.P. has not rebutted LVISD's explanations for those proposed revisions. The Court finds based on its review of the record that the changes are derived from N.P.'s current circumstances, and IDEA liability is not warranted on this basis.

10

supports him in his math class to help the math teacher meet N.P.'s needs specifically, and that N.P.'s ELA teacher modifies his work and allows him additional time to re-do his assignments. (AR, Dkt 21, at 3957, 3959–60, 3965, 3967, 3969, 3975, 3986, 3989–90, 3693). Finally, the Court also notes that LVISD did not immediately place N.P. in the FAC for ELA and math, but rather, proposed this change when it became clear that the individualized modifications and support in the general classroom setting did not suffice to meet N.P.'s needs. (*Id.* at 1144–46) (proposing "trialing" the FAC for ELA and math when N.P. reached sixth grade); *cf. H.W. v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 466 (5th Cir. 2022). LVISD based its proposal on assessments showing that despite existing accommodations, N.P.'s independent reading comprehension was at a second- to third-grade level and his math abilities were at a first- to second-grade level as he reached sixth grade. (AR 1108, 1112, 1144–46). These efforts to support N.P. in a mainstream setting before placing him in the FAC are more than "gestures" and satisfy the Court's review under the *Daniel R.R.* test. 874 F.2d at 1048.

     To the second factor, the record shows that despite these efforts to supplement and modify the general education program, N.P. needs more repetition, time, and 1:1 support for him to retain information and benefit from the curriculum. (Def.'s Mot. Summ. J., Dkt. 23, at 29). As some examples, N.P.'s ELA teacher testified N.P. is struggling with comprehension of fourth grade level text without the teacher first restating the question, assisting with N.P.'s recall of what happened in the story, and then supporting his responses. (AR 3619, 3634). N.P.'s general education World Cultures teacher testified N.P. was successful in his class only with a modified curriculum and grades that were largely based on effort, and/or with intense support. (AR 3334–35). In many cases, N.P. was given alternative assignments to demonstrate knowledge, and still struggled to respond on-topic. (AR 3355–56, 3364, 3367–68). N.P.'s tests were sometimes modified "so much that the curriculum was at points unrecognizable," such as providing two answer choices, with one of the choices being

11

obviously incorrect. (AR 3366, 3368). Even with supports, the World Cultures teacher testified that N.P. "would get overwhelmed with work almost on a daily basis" and there were several times where N.P. "would be visibly upset" and frustrated with the work. (AR 3359, 3369).

Similarly, N.P.'s Texas History teacher testified that even if N.P. was provided a 1:1 aide in class, he does not believe that N.P. could access the curriculum, even at a modified level. (AR 3930–31). N.P.'s resource math teacher testified that N.P. remains unable to differentiate between multiplication and division without significant prompting. (AR 3954–55). N.P. struggles with retaining concepts from day-to-day, and for N.P. to complete work, the teacher must sit with N.P. and prompt him through each step of a problem with examples while other students work independently. (AR 3957–59, 3965). N.P. re-does about eight out of every ten assignments, frequently completing them 1:1 with the teacher. (AR 3964). This testimony supports the conclusion that N.P. requires more supports, which LVISD may appropriately provide in the FAC classroom.

To the third factor, the record shows that in both the math and ELA classes, teachers spend a disproportionate amount of their class time assisting N.P. as opposed to the other students. His math teacher testifies that she works with him 1:1 for more than half of her total class time each day, (AR, Dkt. 21, at 3964–65), and his ELA teacher testified that she also spends the majority of her time with him each day, (*id.* at 3673–74). That is so even with the modified below-grade-level curriculum and slower pace that the school has implemented. Considering all three factors, LVISD has met its burden to place N.P. in the LRE.

   3. <u>Services are provided in a coordinated and collaborative manner by key stakeholders</u>

Turning to the next factor, the Court finds that N.P.'s key stakeholders participated in the IEP process and provided him with services in a collaborative manner. Parents have a right to participate in the IEP process, *see Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003), but their preferences do not necessarily dictate its outcome, *White*, 343 F.3d at 380. Here, the record

shows that the key stakeholders participated in the IEP process, including N.P's parents. Over the course of a year, the ARD committee (which includes both of N.P.'s parents) participated in eight hours of meetings to review N.P.'s evaluations, goals, and needs. (Def.'s Mot. Summ. J., Dkt. 23, at 33). LVISD provided N.P.'s parents with proposals and draft statements a day in advance of the meetings, and the committee took their questions and concerns into account. (*E.g.*, AR, Dkt. 21, at 2713–2722, 2735). Indeed, some of N.P.'s accommodations arose at the suggestion of N.P.'s parents. (*E.g., id.* at 1071, 1090). While the record shows that N.P.'s parents generally reject his placement in a FAC, that alone does not mean they lacked meaningful participation in the process. *See Rockwall Indep. Sch. Dist v. M.C.*, 816 F.3d 329, 341 (5th Cir. 2016) (internal citations omitted). N.P. has not met his burden to challenge the proposed plan based on a lack of appropriate participation by key stakeholders.

On this factor, N.P. also argues that the services were not appropriately provided because the district implemented a "stay-put" during litigation, meaning the IEP goals have not been recently updated. (Pls.' Resp., Dkt. 24, at 5). This argument confuses the Court, as N.P. elsewhere acknowledges he requested a stay-put pending litigation, *id.*[3] Moreover, the Court finds that evaluating N.P. against his previous IEP's goals does not render the IEP substantively inadequate; LVISD is free to consider N.P.'s progress toward his goals in the 2022 "stay-put" IEP plan when calculating a reasonable IEP plan.

---

[3] Invoking a stay-put does not amount to an illegal "take it or leave it" approach on the part of LVISD, as N.P. argues. (Resp., Dkt. 24, at 5). Rather, a stay-put in a prior IEP plan pending litigation on a revised plan is typical to the IDEA process and contemplated by the statute and regulations. *See* 20 U.S.C.A. § 1415(j) ("[D]uring the pendency of any proceedings conducted pursuant to this section, unless the state or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child"); 34 C.F.R. § 300.518(a) ("During the pendency of any administrative or judicial proceeding regarding a due process complaint notice requesting a due process hearing . . . the child involved in the complaint must remain in his or her current educational placement"); *Honig v. Doe*, 484 U.S. 305, 308 (1988) ("The so-called 'stay-put' provision . . . directs that a disabled child shall remain in his or her then current educational placement pending completion of any review proceedings, unless the parents and state or local educational agencies otherwise agree.") (internal quotation marks and citations omitted).

### 4. The IEP shows academic and nonacademic benefits

Finally, N.P.'s plan shows meaningful academic and nonacademic benefits. This factor looks to his overall academic progress and whether the IEP addresses his progress from a "holistic" sense. *H.W.*, 32 F.4th at 468. The inquiry is a "fact-intensive, individualized," one, which looks to the overall academic record. *Id.* The totality of the record shows that in his current IEP (before the new plan was put on hold pending litigation), N.P. has not mastered his academic goals after three academic years, where the plan expects him to master them in one year. (AR 1203–04). As described above, N.P. cannot complete math assignments without 1:1 support, and his progress in ELA is limited as he does not typically understand material above a second-grade level. (Def.'s Mot. Summ. J., Dkt. 23, at 35–36). So too, his grades show that he typically only passes his assessments and his classes when he re-does the test or assignment. (*Id.* at 37). The proposed IEP recognizes these substantial academic challenges N.P. faces in his current classroom environment. At the same time, the IEP recommends he continue to participate in the general education environment for electives (such as Art and "Mythbusters" class) and that he receive half of his science and social studies instruction in the general classroom. (*Id.* at 38–39). The Court finds that on a holistic review, the proposed IEP promotes his nonacademic and academic benefit. *H.W.*, 32 F.4th at 468.

On this factor, N.P. argues that he received an educational benefit under the existing IEP because he passed his classes and made some progress in class. (Pl.'s Mot. Summ. J., Dkt. 22, at 10). But N.P.'s grades are only one part of this analysis, which also looks to his overall academic record. *H.W.*, 32 F.4th at 468. Here, N.P.'s IEP goals and other indicators of progress, like whether he needs additional 1:1 support, needs to re-do most of his assignments, and is falling behind his grade

level, are also relevant. On that overall review, the IEP promotes his academic and nonacademic benefit.

## B.  Plaintiff Has Not Shown a Violation of the IDEA Due to Procedural Error

To prove IDEA liability based on a procedural error, an IDEA plaintiff must show that the procedural error impeded the child's right to a FAPE, significantly impeded the parent's opportunity to participate in the IEP process, or caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); *Adam J.*, 328 F.3d at 811−12. Here, N.P. has not established any such procedural error.

First, N.P. suggests that a procedural error occurred because Texas law requires LVISD to have a teacher certified in the education of students with visual impairments participate in the IEP process, and here, the certified teacher participated only inadequately. (Pl.'s Mot. Summ. J., Dkt. 22, at 3 (citing 19 Tex. Admin. Code § 89.1050(c)(3)(A)). For example, N.P. argues that the certified teacher inadequately documented N.P.'s history with his vision disability and did not attend ARD committee meetings until April 2023, and did not attend two meetings in February 2023. (*Id.* at 3−4). N.P. argues that the certified teacher also obtained inaccurate test results about N.P., citing a second test conducted by another visual evaluator to prove that the certified teacher relied on inaccurate information. (*Id.* at 6). However, N.P. does not show that the certified teacher's purported inadequate participation or inaccurate testing led to a deprivation of educational benefits, impeded the FAPE, or prevented N.P.'s parents from participating in the IEP process. Rather, the record shows that the recommended program under N.P.'s IEP was based on numerous sources considered, not the certified teacher's assessment or participation alone, so the purported errors do not incur IDEA liability.

Second, N.P. argues that the SEHO made errors in its findings of fact. However, the Court finds that the facts were not erroneous, and even if the SEHO decision credited and weighed certain

15

testimony and facts over that which N.P. would have preferred it to highlight, nothing N.P. has argued "made the decision as a whole incorrect or unreliable." *Renee J. v. Houston Indep. Sch. Dist.*, 333 F.Supp.3d 674, 699 (S.D. Tex. 2017). More specifically, N.P. challenges the below five findings of fact, none of which amount to procedural error.

Finding of Fact #10 states that "[a]s part of the FIE, multiple assessments were conducted, including a Functional Vision Evaluation/Learning Media Assessment (FVE/LMA) on April 22, 2022, by Sharon Cochran, a TVI, which determined that Student did not meet the eligibility criteria for a student with VI." (AR, Dkt. 21, at 10). N.P. argues Finding of Fact #10 is erroneous because he disagrees with his not qualifying as a student with a Visual Impairment based on the LVE in 2022. (Pl.'s Mot. Summ. J., Dkt. 22, at 4–5). However, the fact that N.P. disagrees with the evaluation made in 2022 does not make the finding of fact erroneous, nor does it rise to the level of rendering the whole decision unreliable or inaccurate. The record shows that the statements made were accurate. (AR, Dkt. 21, 879–82).

Finding of Fact #14 states that "[t]he FAC is a program which focuses on academic and developmentally appropriate functional skills. The program addresses skills through intensive, hands-on learning and the use of research-based strategies to meet the needs of individual students. Instruction is delivered in a low staff-to-student ratio. Opportunities for teaching generalization of skills into other settings and environments are available." (AR, Dkt. 21, at 11). N.P. argues Finding of Fact #14 was erroneous because it failed to consider testimony from a former FAC employee about the conditions in the FAC classroom. (Pl.'s Mot. Summ. J., Dkt. 22, at 5). However, the fact that the SEHO did not credit that particular witness does not mean that the finding of fact was inaccurate. The Court also notes that the testimony from the former employee does not speak to N.P.'s particular experiences, as N.P. has never received services in the FAC classroom.

16

Finding of Fact #46 states that "[a]t the hearing, Student's teachers testified that Student's grades do not accurately reflect his mastery of classroom content. Student is graded instead on effort, attitude, and participation. He performs below grade level and is working towards mastering pre-requisite skills." (AR, Dkt. 21, at 20). N.P. argues Finding of Fact #46 is erroneous because he disagrees with the extent to which N.P. was graded on effort in his classes. (Pl.'s Mot. Summ. J., Dkt. 22, at 5−6). However, the SEHO does not indicate that all N.P.'s grades are solely based on "effort, attitude, and participation," but instead uses this as a supporting detail for the finding that N.P.'s performance in class has fallen behind his goals and grade level, despite his passing grades, as described above.

Finding of Fact #47 states that N.P.'s "teachers also expressed concerns that Student requires substantial help from peers and teachers, as well as regular prompting, in order to complete his work. Teachers are forced to choose between educating Student or educating the rest of the classroom." (AR, Dkt. 21, at 20). N.P. argues Finding of Fact #47 is erroneous because N.P. is not a discipline problem and his teachers testified that he collaborates with other students. (Pl.'s Mot. Summ. J., Dkt. 22, at 6−7). However, even if N.P. collaborates well with other students and only rarely has disciplinary issues, it is still supported by the record that N.P. requires substantial help and prompting, as the SEHO found. The record shows N.P. participates in class but requires a lot of help and redirection from his peers and teachers and is not able to participate at the level expected. (AR 886, 952, 961, 3284, 3326, 3369−70, 3916, 3933). As such, the SEHO's finding of fact is not erroneous.

Finding of Fact #49 states that "[a]ccording to his teachers, Student re-does many of his assignments and tests. This makes his grades an inaccurate picture of his academic progress." (AR, Dkt. 21, at 21). N.P. argues Finding of Fact #49 is erroneous because all students are allowed to re-do assignments. (Pl.'s Mot. Summ. J., Dkt. 22, at 7−8). However, the SEHO mentions N.P.'s

17

frequent re-doing of his assignments as part of an overall assessment of many indicators of his academic progress, and to demonstrate the level to which N.P. is receiving a meaningful educational benefit from his current setting. That other students may also re-do assignments does not negate the SEHO's overall conclusion about N.P.'s academic performance, as described above.

For those reasons, N.P. has not demonstrated any procedural errors or incorrect findings of fact in the SEHO decision below and has not met his burden to challenge the SEHO officer's findings.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendant's Motion for Judgment on the Administrative Record, (Dkt. 23), is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment, (Dkt. 22), is **DENIED**.

**IT IS FINALLY ORDERED** that the bench trial date set for May 15, 2025 is **VACATED**. The court will issue final judgment via separate order.

**SIGNED** on March 20, 2025.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE